IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                    Cr. No. 18-2315 KG

FRANCISCO ARMANDO MARTINEZ,

      Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court upon Defendant's Motion to Suppress, filed September 5, 2018. (Doc. 41). The United States filed a response on September 18, 2018, and Defendant filed a reply on October 9, 2018. (Docs. 44 and 51). On October 17, 2018, the Court held an evidentiary hearing on Defendant's Motion to Suppress. Andrew Covington and Luis Martinez represented the United States, and case agent Roberto Morales was present. Rachel Nathanson and Barbara Mandel represented Defendant, who was present as well. Having considered Defendant's Motion to Suppress, the accompanying briefing, the evidence admitted at the October 17, 2018, hearing, and the argument of counsel at that hearing, the Court grants Defendant's Motion to Suppress.

*I. Findings of Fact*[1]

On April 10, 2018, United States Border Patrol Agent Robert Diharce partnered with Border Patrol Agent Guillermo Ramirez. They began their shift at 6:00 a.m. Usually between about 7:30 a.m. or 7:45 a.m., other Border Patrol agents return to the Border Patrol station after finishing their shifts. Agent Diharce testified that "quite a few cases" of narcotics or illegal alien smuggling have occurred during this time. Tr. at 8.[2]

On the morning of April 10, 2018, Agents Diharce and Ramirez were in a marked Border Patrol pickup truck. Agent Diharce was driving the pickup truck while Agent Ramirez was in the passenger seat. At 7:45 a.m. the Agents were traveling southbound on Highway 113, a two-lane highway. Highway 113 is a route commonly used for smuggling, because there is no Border Patrol checkpoint located on this roadway. Aside from this case, Agent Diharce had no recent involvement with a smuggling case on that highway while Agent Ramirez was personally involved in other one smuggling case on Highway 113 in the preceding year.

As they traveled south, the Agents observed a white Monte Carlo sedan traveling northbound on Highway 113. Agent Diharce "noticed that the passengers in the rear seat were crowded. They didn't seem to have enough space for each individual on one seat." Tr. at 10. Agent Diharce thought it was "a little odd" to have "three or more" persons in the back seat. *Id.* Consequently, a few seconds (or maybe a minute) after passing the Monte Carlo, Agent Diharce

---

[1] In deciding a motion to suppress, the Court views the evidence in the light most favorable to the United States. *See, e.g., United States v. Turner*, 2013 WL 5727404, at *9 (D. Kan.) ("While the Court is cognizant that it must view the facts in the light most favorable to the Government, it may not draw inferences that are not supported by the record, nor accept facts that are contrary to the record."); *United States v. Ortega*, 2012 WL 12894242, at *4 (S.D. Fla.) ("viewing the facts adduced at the suppression hearing in the light most favorable to the government....").

[2] The Court's citation to the hearing transcript refers to the court reporter's original unedited version. Any final transcript may contain slightly different page and/or line numbers.

made a U-turn to follow the Monte Carlo so he could get a better look at the passengers. Tr. 11, 74.

The posted speed limit on Highway 113 is 55 miles per hour, and the Agents estimated the Monte Carlo was traveling 75-80 miles per hour. The Agents followed the Monte Carlo a mile or two behind it and kept the vehicle in view. The Agents were traveling about 70-75 miles per hour.

When the Monte Carlo approached Interstate 10 (I-10), about 10-11 miles from where the Agents began following it, the Monte Carlo entered the westbound lane of the interstate. The Agents continued to follow the Monte Carlo on the interstate but still could not get a good look at the passengers. Agent Diharce did not consider stopping the Monte Carlo while it traveled on I-10. Agent Ramirez testified that he and Agent Diharce did not have reasonable suspicion to stop the Monte Carlo as it traveled on either Highway 113 or I-10. Tr. 62 ("We were still trying to develop our you know reasonable suspicion, you know.").

The Agents followed the Monte Carlo as it traveled ten miles and exited I-10 in Lordsburg, New Mexico, and then proceeded to a Pilot Truck Stop. By that point, the Agents had been following the Monte Carlo a total of 20-21 miles. At no point did the Agents activate their emergency lights. The Monte Carlo stopped at the truck stop, parking at the last gas pump island on the far west end and adjacent to the gas pump. There were no other cars parked at this island, nor were there any people "milling around" in the vicinity of the Monte Carlo, Tr. 45, though Agent Ramirez recalled there may have been one or two vehicles at other gas pumps at the truck stop. He also said there may have been people walking in and out of the Pilot Truck Stop store. The parking lot of the Pilot Truck Stop has two vehicle entrances.

The Agents drove to the same gas pump island and parked approximately ten feet behind the Monte Carlo. Agent Diharce noticed the driver, later identified as Defendant, get out of the vehicle. After Defendant walked three to four steps towards the Pilot Truck Stop store, he turned around to walk back to the driver's side of the vehicle just as Agent Diharce approached him. Agent Diharce testified he did not know why Defendant turned back toward the Monte Carlo. Agent Ramirez testified that Defendant turned back towards the Monte Carlo because he noticed that Agent Diharce and himself had parked behind the Monte Carlo. Tr. at 81-82. Agent Ramirez suggested that Defendant heard the doors of the pickup truck open behind him. *Id.* at 82.

Defendant walked toward the rear of the Monte Carlos, stopping at the rear of the Monte Carlos between it and the gas pump. Agent Diharce approached and stood approximately three feet (or no more than five feet) from Defendant next to the gas pump. Tr. 23, 66. At that point, Agent Diharce observed four to five people in the back seat of the Monte Carlo. Agent Ramirez exited the pickup truck at the same time as Agent Diharce and walked to the rear passenger's side of the Monte Carlo. Both Agents were in uniform, including badges, and were armed. Tr. at 38.

Agent Diharce said, "Good morning," to Defendant and introduced himself and Agent Ramirez as Border Patrol agents. Tr. at 21. Agent Diharce then asked Defendant if he was a United States citizen. Defendant answered that he was. Agent Diharce then asked Defendant if the people in the Monte Carlo were his family. Defendant replied that he did not know them; that he picked them up on the side of the highway after they had flagged him down.

Agent Ramirez asked Defendant if he could speak with the passengers. Defendant then opened the driver's door of the Monte Carlo and, from there, rolled down the passenger's side

window.  Agent Ramirez leaned into the vehicle, questioned the passengers, and determined they were Mexican citizens and that they did not have immigration documents to be in the United States legally.  Consequently, Agent Ramirez indicated to Agent Diharce that the passengers did not have proper documentation.

As a result, Agent Diharce patted down Defendant to place him under arrest.  Agent Diharce was asking Defendant to put his hands behind his back when Border Patrol Agent Amado Camacho arrived.  Agent Diharce asked Defendant if he had any weapons on him, and Defendant responded that there was a pistol in the Monte Carlo.  Agent Camacho subsequently located the pistol and ammunition inside the Monte Carlo.

Agent Diharce testified that from the time he and Agent Ramirez arrived at the Pilot Truck Stop until the time Agent Diharce arrested Defendant, about five minutes elapsed.  Tr. at 26.

## II.  Conclusions of Law

Defendant argues that both his Fourth Amendment right to be free from an unreasonable seizure and his Fifth Amendment right to have his *Miranda* rights read to him prior to a custodial interrogation were violated.  He moves to suppress the statements by the passengers, the pistol, and the ammunition. The United States opposes Defendant's Motion to Suppress in its entirety.

### A.  Whether the Fourth Amendment was Violated

Defendant claims that his initial encounter with Agents Diharce and Ramirez was an investigatory detention, a *Terry* stop, subject to the Fourth Amendment's reasonable suspicion requirement.  The United States argues that the encounter was consensual and, therefore, not subject to the Fourth Amendment.

The Court recognizes that Defendant has the burden of proving whether the Fourth Amendment is implicated. *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017). The United States, on the other hand, bears the burden of proof by the preponderance of the evidence to show that the challenged action did not violate the defendant's Fourth Amendment rights. *United States v. Matlock*, 415 U.S. 164, 177 (1974). The Court will first address whether the encounter was consensual.

*1. Whether the Encounter with Agents Diharce and Ramirez was Consensual*

In determining whether an encounter between a police officer and a citizen is consensual, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)). The Court examines the following non-exhaustive list of factors to determine whether a reasonable person would feel free to terminate a police encounter:

- the location of the encounter, particularly whether the defendant was in an open public place where he was within the view of persons other than police officers (Tenth Circuit cases "view police-citizen interactions in nonpublic places and police-citizen interactions in the absence of other members of the public similarly");

- whether the police officers touched or physically restrained the defendant;

- whether the police officers were uniformed or in plain clothes;

-  whether the police officers' weapons were displayed;

- the number, demeanor and tone of voice of the police officers;

6

- whether and for how long the police officers retained the defendant's personal effects like tickets or identification; and

- whether or not the police officers specifically advised the defendant that he had the right to terminate the encounter or to refuse consent to the encounter.

*Hernandez*, 847 F.3d at 1264-65 (citation omitted). "Although no single factor is dispositive, the 'strong presence of two or three factors' may be sufficient to support the conclusion a seizure occurred." *Id.* at 1264 (citation omitted). Viewing all the circumstances surrounding this encounter and considering the non-exhaustive list of factors, the Court concludes this encounter was non-consensual.

In this case, the parking lot of the Pilot Truck Stop, although public, had only one or two vehicles at the gas pumps, and some people were parked at the store. Defendant's vehicle, meanwhile, was parked at the far western gas pump, at the end of a row of four gas pump islands. Defendant's vehicle was not directly in front of the entrance to the store. The gas pumps also blocked the view of Defendant and Agent Diharce from the other gas pumps and, presumably, from any other patrons pumping gas. No one was milling about near Defendant's vehicle. Agents Diharce and Ramirez's marked vehicle was parked 10 feet behind Defendant's vehicle. The parking lot has two entrances and the encounter occurred during day light hours.

Viewing these facts in the light most favorable to the United States, the Court finds that although the Pilot Truck Stop is a public place, the location of the interaction between Defendant and Agents Diharce and Ramirez occurred in an out-of-the way part of the parking lot, not readily in view of any patrons. *Cf United States v. Thompson*, 546 F.3d 1223,1227 (10th Cir. 2008) (finding consensual encounter "occurred in a public place—the parking lot of a 7–11 store—in view of other patrons."). On the other hand, the Court finds that Defendant's vehicle

was not blocked in such a manner that Defendant could not drive away. *See United States v. Ringold*, 335 F.3d 1168, 1173 (10th Cir. 2003) (noting that although two officers "were standing on either side of [the defendant] and the gas pump, nothing prevented [the defendant] from simply entering his vehicle and driving away."). Considering this situation, the Court determines that the factor relating to location is not determinative one way or the other.

The Court further finds that although Agents Diharce and Ramirez did not touch or physically restrain Defendant, they were uniformed and had holstered weapons. In addition, the encounter initially involved two Border Patrol agents. *Hernandez*, 847 F.3d at 1266 ("Although the presence of two uniformed and armed officers does not automatically transform every police-citizen encounter into a nonconsensual one, it is a relevant factor.").

Agent Diharce's demeanor was non-threatening and he used a conversational tone when speaking to Defendant. Even so, after Agent Diharce introduced himself to Defendant, he did not preface his conversation by asking Defendant if he would answer some questions. Instead, Agent Diharce immediately asked, "Are you a United States citizen?," a question intended to elicit an incriminating response. When Defendant responded, "Yes," Agent Diharce then questioned Defendant about the people in the back seat of the car. These questions are clearly incriminating/investigatory in nature and asked in a coercive manner.

The Tenth Circuit, in *Ringold*, held that "the mere fact that officers *ask* incriminating questions is not relevant to the totality-of-the-circumstances inquiry—what matters instead is 'the manner' in which such questions were posed." 335 F.3d at 1173. The Tenth Circuit further noted that, "Accusatory, persistent, and intrusive questioning can turn an otherwise voluntary encounter into a coercive one." *Id.* at 1174 (quoting *United States v. Little,* 18 F.3d 1499, 1504 (10th Cir. 1994)). The Tenth Circuit in *United States v. Glass* also recognized that an "officer's

particularized interest in an individual may so change the nature of a consensual encounter that a reasonable person would not feel free to leave when asked to consent to a search." 128 F.3d 1398, 1406–07 (10th Cir. 1997). For example, in *United States v. Jones*, a detective in a high crime area immediately asked the defendant to lift his shirt to see if there was a weapon and then asked the defendant to consent to a pat down when the detective did not see a weapon. 678 F.3d 293, 303–05 (4th Cir. 2012). The Fourth Circuit stated that "[a] request certainly is not an order, but a request—two back-to-back requests in this case—that conveys the requisite show of authority 'may be enough to make a reasonable person feel that he would not be free to leave.'" *Id.* at 303 (citation omitted). The Fourth Circuit then held that

> under the circumstances of this case, we conclude that a reasonable person would not have felt free to walk away and ignore Det. Aeschlimann's nearly immediate "requests" that the person first lift his shirt and then submit to a pat down search. By making such intrusive "requests" almost immediately upon approaching Jones and his companion, Det. Aeschlimann communicated, through his conduct, that this was not just a routine encounter with the police.

*Id.* at 303-04. Consequently, the Fourth Circuit concluded that a reasonable person in the defendant's position would believe "that the officers suspected him of some sort of illegal activity in a 'high crime area,' which, in turn, would convey that he was a target of a criminal investigation and thus not free to leave or terminate the encounter." *Id.* at 304.

In sum, the following evidence is relevant to the issue of whether the encounter was consensual: the area of this encounter is in close proximity to the border where illegal entries occur; the number of passengers in the vehicle; the manner of the Agents' stop behind Defendant's vehicle at the truck stop; Agent Diharce's direct approach to Defendant at the gas pump; the fact that Agents Diharce and Ramirez were uniformed and armed; Agent Diharce's immediate questioning of Defendant as to his citizenship and, within moments, Agent Diharce's

questioning of Defendant about the passengers; and Agent Diharce's failure to advise Defendant that he had the right to terminate the encounter or to refuse to consent to the encounter.

Viewing the totality of that evidence, even in a light most favorable to the United States, the Court concludes a reasonable person in Defendant's shoes would believe that he was not at liberty to ignore the police presence and go about his business. Defendant, therefore, has carried his burden of demonstrating that the encounter was not consensual and that he was seized by the Agents for investigatory purposes, thereby, implicating the Fourth Amendment.

### 2. Whether Agents Diharce and Ramirez had Reasonable Suspicion to Conduct an Investigatory Detention

Because the seizure of Defendant constituted an investigatory detention, i.e., a *Terry* stop, the United States has the burden of proving that "the officers had specific and articulable facts and rational inferences drawn from [the totality of the circumstances to] giv[e] rise to a reasonable suspicion that [the defendant] was involved in criminal activity." *Hernandez*, 847 F.3d at 1268. "[C]ommon sense and ordinary experience are to be employed and deference is to be accorded to a law enforcement officer's ability to distinguish between innocent and suspicious actions." *Id.* at 1269 (citation omitted). However, "[a] police officer cannot legally detain a person simply because criminal activity is afoot. The particular person that is stopped must be suspected of criminal activity." *Id.* at 1268 (citation omitted). "Inchoate suspicions and unparticularized hunches ... do not provide reasonable suspicion."[3] *Id.* at 1270 (citation omitted).

Defendant argues the Agents did not have reasonable suspicion to detain him. The relevant circumstances known to Agents Diharce and Ramirez prior to Agent Diharce's questioning of Defendant consist of the following: (1) the Monte Carlo sedan driven by

---

[3] Counsel agree that the *Brignoni-Ponce* factors for determining reasonable suspicion in border areas do not apply here. *See United States v. Brignoni-Ponce*, 422 U.S. 873 (1975).

Defendant had three or more people in the back seat; and (2) Defendant was driving the car in an area known for alien smuggling, although Agent Ramirez only encountered one other alien smuggling case in the last year while Agent Diharce had only encountered this case recently.

Significantly, Agent Ramirez admitted, and Agent Diharce implicitly agreed, that they had no reasonable suspicion to stop Defendant during the time they followed the Monte Carlo to the Pilot Truck Stop. The Court agrees. Upon arriving at the Pilot Truck Stop, no new facts presented themselves to the Agents to give rise to reasonable suspicion. The Agents still had the same facts before them, specifically: a car with more than three persons seated in the back seat that happened to be traveling through an area where illegal alien smuggling has occurred. Viewing the totality of these circumstances in the light most favorable to the United States, these facts do not constitute specific and articulable facts, nor can one draw rational inferences from those facts, to reasonably suspect Defendant was involved in any criminal activity.

Even if there was somehow reasonable suspicion for the initial detention, once Defendant responded, "Yes," to Agent Diharce's question as to United States citizenship, Agents Diharce and Ramirez still did not have a specific and articulable reason, or a rational inference, to suggest Defendant was involved in criminal activity. At most, Agents Diharce and Ramirez had a hunch Defendant was involved in transporting illegal aliens. The United States, thus, has failed to carry its burden of proving by a preponderance of the evidence that the Agents' suspicion for detaining Defendant for investigatory purposes was reasonable. Consequently, Agents Diharce and Ramirez violated Defendant's Fourth Amendment right to be free from an unreasonable seizure.

### B. Whether the Fifth Amendment was Violated

Defendant also argues that Agent Diharce violated the Fifth Amendment by interrogating him at the Pilot Truck Stop without giving a *Miranda* warning first. The United States argues

that the Fifth Amendment was not implicated because Defendant was not in custody when Agent Diharce questioned Defendant at the Pilot Truck Stop.

Under *Miranda*, the United States is barred from using at trial statements obtained during a custodial interrogation before the defendant is given the *Miranda* warning, unless the defendant waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "*Miranda* thus established a two-part analysis for determining when the prescribed procedural safeguards must be provided: (1) the individual must be in custody, and (2) the individual must be subjected to questioning that meets the legal definition of interrogation." *United States v. Revels*, 510 F.3d 1269, 1273 (10th Cir. 2007). The burden initially falls on the defendant to demonstrate that he was subject to custodial interrogation, and then the burden shifts to the United States to prove, by a preponderance of the evidence, that its police officers acted legally. *See, e.g., United States v. Broughton*, 983 F. Supp. 2d 224, 228–29 (E.D.N.Y. 2013), *aff'd,* 600 Fed. Appx. 780 (2d Cir. 2015). *See also* 23 *C.J.S. Criminal Procedure and Rights of Accused* § 1315 ("The burden is initially on the defendant to show that a statement was obtained through custodial interrogation…."); *id.* at § 1312 ("It is the state's burden to demonstrate by the federal standard of proof by a preponderance of the evidence that preliminary factors of a custodial interrogation were not present to trigger the need for *Miranda* warnings….").

A person is "in custody" for *Miranda* purposes when under the totality of the circumstances "a reasonable [person] in the suspect's position would have understood his situation . . . as the functional equivalent of formal arrest." *Id.* at 1273. Whether police subject a defendant to a lawful investigative detention under the Fourth Amendment is not dispositive of whether the police officer should have advised the defendant of his *Miranda* rights under the Fifth Amendment. *Id.* at 1274. Courts look to the following non-exhaustive list of factors to

determine the *Miranda* custody issue: (1) whether the circumstances showed a "police-dominated atmosphere;" (2) whether the nature and length of the police officer's questioning was accusatory or coercive; and (3) whether the police officer made the defendant aware that he was free not to answer questions, or to terminate the interview. *Id.* at 1275.

In this case, the evidence shows that there was a police-dominated atmosphere. First, Agents Diharce and Ramirez were in uniform with holstered weapons and driving a marked vehicle. Second, the marked vehicle was parked ten feet behind the Monte Carlo. Finally, the questioning occurred in an area of the parking lot which was blocked to some extent from public view by the gas pumps and which did not have any members of the public at that time.

In addition, although the length of the questioning was less than five minutes and Agent Diharce introduced himself to Defendant, Agent Diharce immediately asked Defendant an incriminating question about his citizenship. A reasonable person could interpret that question as accusing Defendant of being an illegal alien. Agent Diharce's follow up question about the passengers in the Monte Carlo would also communicate to a reasonable person that Agent Diharce was accusing Defendant of transporting illegal aliens. Moreover, neither Agents Diharce nor Ramirez informed Defendant that he was free not to answer questions or to otherwise end the interview.

Viewing the totality of the circumstances in the light most favorable to the United States, the above three factors support a determination that a reasonable person in Defendant's position would have understood his situation as the functional equivalent of a formal arrest. Therefore, Defendant has carried his burden of showing that he was in custody when Agent Diharce questioned him.

The Court must next determine whether Agent Diharce's questioning of Defendant was an "interrogation." "[T]he term 'interrogation' ... refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v Innis*, 446 U.S. 291, 301 (1980). The Court asks whether the officers "should have known that their words or actions—whether framed as a question or not— were reasonably likely to elicit an incriminating statement." *United States v. Cash*, 733 F.3d 1264, 1277 (10th Cir. 2013). This is an "objective [inquiry,] ... and [the court] focus[es] on the perceptions of a reasonable person in the suspect's position rather than the intent of the investigating officer." *Id.* (internal quotation marks omitted).

In this case, Agent Diharce's immediate opening question, "Are you a United States citizen?" would relay to a reasonable person that Agent Diharce was seeking an incriminating statement in an effort to establish that Defendant was not legally in the United States. Agent Diharce's follow up question regarding the passengers, likewise, would relay to a reasonable person that Agent Diharce was seeking incriminating statements from Defendant related to illegal alien smuggling. Even viewing the totality of the evidence in the light most favorable to the United States, the Court determines Defendant has demonstrated that Agent Diharce subjected him to an interrogation during the initial encounter at the Pilot Truck Stop.

To summarize, Defendant has shown that Agent Diharce conducted a custodial interrogation of Defendant without first reading *Miranda* warnings to him. The United States, meanwhile, has failed to show by a preponderance of the evidence that Agent Diharce, otherwise, acted lawfully in questioning Defendant. Agent Diharce's questioning, consequently, constitutes a violation of Defendant's rights under the Fifth Amendment.

III.    *Conclusion*

Having determined that Defendant's Fourth and Fifth Amendment rights were violated, the Court grants Defendant's Motion to Suppress.  Consequently, all evidence obtained as a result of Defendant's detention and interrogation by Agent Diharce, including any of Defendant's statements, statements by the passengers in the Monte Carlo, the pistol, and the ammunition, are suppressed.  *See United States v. Olivares-Rangel*, 458 F.3d 1104, 1108–09 (10th Cir. 2006) ("a defendant may also suppress any other evidence deemed to be 'fruit of the poisonous tree,' (*i.e.,* evidence discovered as a direct result of the unlawful activity), by showing the requisite factual nexus between the illegality and the challenged evidence").

IT IS ORDERED that Defendant's Motion to Suppress (Doc. 41) is granted.

_____
UNITED STATES DISTRICT JUDGE